# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 3:13-00153 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| DORIAN AYACHE and ) | |
| THERESA VINCENT. ) | |

## MEMORANDUM

Defendant Dorian Ayache has filed a Motion to Dismiss Count Ten of the Indictment (Docket No. 34), to which the government filed a Response in opposition (Docket No. 56), and Ayache filed a Reply (Docket No. 58). Defendant Vincent has joined the motion (Docket No. 47). For the reasons stated herein, the motion will be denied.[1]

## BACKGROUND

### I. Relevant Facts and Procedural History

The factual and procedural history of this case is set forth in previous opinions in this case, familiarity with which is assumed. (*See* Docket Nos. 35 and 55.) Briefly, defendant Ayache operated a business called "Three Angels Farm," which was in the business of hauling horses from auctions to other locations for slaughter. Following a series of roadside accidents and other violations of federal and/or state laws by the business and its drivers, Ayache and his business came under investigation by the Federal Motor Carrier Safety Administration ("FMCSA") (a division within the United States Department of Transportation ("DOT")). In the interest of public safety, the FMCSA issued a so-called Imminent Hazard Order to Ayache and

---

[1]Vincent joined the motion summarily. Because Ayache made the relevant arguments, the court will generally refer to "Ayache" as the moving party, unless otherwise noted.

1

Three Angels Farm on June 28, 2012 ("First IHO"). Pending compliance with multiple safety and licensing directives, the First IHO ordered Ayache and Three Angels Farms to cease all commercial operations, prohibited the operation of four specific vehicles, and forbade Ayache from engaging in "any sale, lease, or other transfer of equipment" without the written approval of a regional administrator. Essentially, the First IHO completely shut down Three Angels Farm and precluded Ayache from operating or disposing of the referenced commercial motor vehicles without express DOT authorization.

According to the Indictment (Docket No. 1), Ayache attempted to evade the restrictions set forth in the First IHO by selling his trucks to co-defendant Theresa Vincent, assisting Vincent in setting up a business that was essentially a "reincarnation" of Three Angels Farm under a different name ("Terri's Farm"),[2] and by operating and/or causing to be operated the very trucks subject to the First IHO. The FMCSA discovered this conduct and issued an additional imminent hazard order ("Second IHO"), which essentially extended the terms of the First IHO to Terri's Farm and to the individuals (including Ayache and Vincent) allegedly associated with the new enterprise.

According to testimony before the grand jury by DOT Special Agent Tammie Moore, on March 8, 2013, Moore served a grand jury subpoena on Vincent seeking documents that included Vincent's communications with Ayache.[3] Vincent did not produce any documents in response to

---

[2]The record contains interchangeable references to "Terri's Farm" and "Terri's Farms." The appropriate name of the company appears to be "Terri's Farm."

[3]The record contains, *inter alia*, copies of the Compliance Review Reports for Three Angels Farm and Terri's Farm, Moore's notes of an October 25, 2012 interview with Vincent, an August 10, 2012 email exchange between Vincent and the DOT, an August 14, 2012 email exchange between Vincent and Ayache, a transcript of Agent Moore's testimony to the grand jury on May 22, 2013, a transcript of Agent Moore's testimony to the grand jury on September

the subpoena. On May 2, 2013, Moore served a second grand jury subpoena on Vincent, which again requested the production of documents. Vincent appeared on May 22, 2013 to testify before the grand jury, but again failed to produce any documents. On June 7, 2013, Vincent finally responded to the second subpoena by producing 35 emails. However, based on Agent Moore's knowledge of specific dates of email communication that were not reflected in that production, Moore determined that Vincent's production was incomplete. Moore followed up with Vincent, who then produced those emails.

During her grand jury testimony on May 22, 2013, Vincent testified concerning the (brief) operations of Terri's Farm.[4] During her testimony, Vincent in substance suggested that opening the new business was a joint idea between her and Ayache, that she "ran the business of Terri's Farm," and that Ayache was "officially" just a "driver" for the new company and "unofficially" her "advisor" in running it. Vincent admitted that, at the time Terri's Farm was created in her name, she knew that Ayache "was limited on his transportation situation" and that "he did have some problems with the DOT." (*See* 5/22/13 Vincent GJ Transcript at 15:4-9.) She also admitted that, prior to her receipt of the Second IHO, she knew that Ayache had been placed out of service by the DOT, although she claims to have dismissed the substance of those restrictions as "just a bunch of political crap that wasn't that big of a deal." (*Id.* at 15:24-16:13.)[5] She also

---

11, 2013, and a transcript of Vincent's May 22, 2013 testimony to the grand jury. (*See* Docket No. 34, Exs. A-C and E-I.)

[4]Vincent testified voluntarily without the assistance or presence of counsel. The prosecutor advised her of her Fifth Amendment right against self-incrimination and her Sixth Amendment right to the assistance of counsel, both of which she stated that she understood and impliedly waived. (*See* 3/22/13 Vincent GJ Transcript at 3:11-4:25.)

[5]In particular, when asked whether, "prior to being served with these papers [the Second IHO] had you been aware that *Dorian Ayache* had been placed out of service by [the] D.O.T.,"

3

testified that, at the time Terri's Farm was formed, she "knew of . . . the out of service thing" and that "*I knew he was not allowed to haul loads*." (*Id.* at 16:16-22.) In other portions of her testimony, she testified that "I knew that he was not allowed to haul loads under Three Angels" but nevertheless believed that it was legal for Ayache to drive for her and that she was not aware that Ayache could not sell his trucks.

The grand jury also heard testimony from Vincent about the nature of Ayache's role in forming and operating Terri's Farms. She admitted that Ayache essentially walked her through the application process to obtain a DOT operating number for Terri's Farm, that Terri's Farm's operations utilized the three trucks that Ayache purported to sell to it along with at least two trailers that remained in Ayache's name, that the trucks remained insured under Ayache's name after purchase, that Vincent did not have title to the trucks reflecting her name,[6] that Ayache called in hauling trips and handled customer payments, that Terri's Farm had no corporate bank account and used only cash, and that Terri's Farm only hauled loads for Ayache.

Vincent also testified about subsequent developments related to Terri's Farm and the nature of her interactions with Ayache. She testified that, in August 2012, apparently soon after being shut down by the Second IHO, she passed all of Terri's Farm's business records to her business colleague, Larry Montgomery, because she (Vincent) was "not a very good records keeper." (*Id.* at 31:4-9.) She testified that Montgomery later informed her that he destroyed all

---

she responded: "I believe so. I believe that's – I – I did know that but I didn't know the details. I should have made it my business to know why, but I thought there was some politics going on. There's another gentleman named Terry Blair that I thought was basically siccing the D.O.T. on him and I thought it was basically just a political load basically [sic]." (3/22/13 Vincent GJ Transcript at 15:24-16:8 (emphasis added).)

[6]Vincent testified that title bearing her name "hadn't come back yet." (3/22/13 Vincent GJ Transcript at 38:3-6.)

4

of these records in October 2012. Vincent also testified that she used her personal email to communicate with Ayache and Montgomery but believed that her emails likely did not contain any "details," other than "rude comment[s]" relating to Terri's Farm. (*Id.* at 32:19-24.) Vincent also testified that she had not talked with anyone other than Montgomery about the federal government's investigation. She also averred that, for "quite awhile," she had had "absolutely no contact with [Ayache] whatsoever," aside from forwarded emails without any substantive text. (*Id.* at 35:7-15.) She specifically testified that she had not had any contact with Ayache within the "last five months" (*i.e.*, from approximately January 2013 through the date of her testimony) and that she never contacted him about the government's ongoing investigation. (*Id*. at 35:16-36:2.)

On September 11, 2013, Agent Moore testified before the grand jury. Moore testified that public records reflected that, on July 16, 2012, Ayache had sold trucks to Vincent and that Ayache sold a third truck to Vincent on July 19, 2012, before repossessing the vehicles. Moore also testified that Terri's Farm began operations just a few weeks after Ayache received the First IHO, that (to Moore's understanding) Ayache approached Vincent about obtaining her own DOT number, that Terri's Farm shipped livestock only for Ayache, that Ayache advised Vincent concerning the new company and that Vincent followed his advice, that Ayache arranged the loads and paid the drivers, that Vincent knew when Terri's Farm was formed that Ayache "had problems with the DOT and was limited in terms of his ability to conduct transportation," and that, at the time, Vincent knew that Ayache could not haul loads himself. Moore also testified that Vincent asked the DOT whether she could haul loads in trucks that belonged to Ayache, that the DOT responded that she could not, and that, in a subsequent email a few days later (on

5

August 14 2012), Vincent proposed to restructure the sale to conceal it from the DOT. The prosecutor read the following excerpts from that email, which Agent Moore confirmed were accurate:

> As far as the DOT is concerned, I'm going to buy a truck from another individual. As far as you and I are concerned, I'm going to pay you cash for your black truck, [] but you're actually going to sell it to this other individual . . . . It looks like I'm buying a different truck from this other guy. And then you can sell your truck to him, but all that will look like separate deals to DOT hopefully and they'll be off our backs and we can get back to hauling horses[.]

(9/11/13 Moore GJ Transcript at 17:16-18:15.) Moore also testified that phone records showed that, notwithstanding Vincent's May 22, 2013 grand jury testimony to the contrary, Ayache had called Vincent nine times between March 13, 2012 (just five days after Vincent and Ayache were served with the grand jury subpoenas) and April 15, 2012 (approximately five weeks before Vincent testified before the grand jury). These calls included a March 13 call that lasted four minutes and seventeen seconds and a March 21 call that lasted six minutes and twenty-six seconds.

Agent Moore also had the following exchange with the grand jury:

GRAND JUROR: Did she [Vincent] operate anything after [the Second] IHO?

THE WITNESS: She did not, not that we're aware of. . . .

GRAND JUROR: And then does that IHO coincide with the time when she e-mailed DOT, or the Department, the safety arm of it, and said, can I use these trucks and that department responded in the affirmative do not use these trucks?

THE WITNESS: The e-mail [] that Theresa Vincent sent to specifically requesting [sic] was on August 10th of 2012, and she was specifically aware of the Imminent Hazard Order, she knew that Dorian [Ayache] was under it. She knew that the equipment was under it, and she was aware at that point that she was also under investigation and Motor Carrier [*i.e.*, the FMCSA] had already been speaking with her obviously because she sent them the e-mail. But yes, that was on August the 10th that she was told no that she could not operate and it was

6

within I believe a day or two, that she sent the proposition to Mr. Ayache. It was all there in that time frame of August the 10th.

    . . . .

GRAND JUROR: . . . I think you stated at some point in there when she set up Terri's Farm and got the . . DOT number, you're saying that she knew that Dorian Ayache was having trouble with the DOT, she knew there was a problem with these vehicles and we know this because of e-mail communications or how do we know this, how do we know that she knew?

THE WITNESS: It was her grand jury testimony.

GRAND JUROR: She admitted in the Grand Jury testimony that she knew there was problems when she –

THE WITNESS: She knew that he was having problems. She also admitted that in an interview that we had – that we had conducted prior but she also admitted that in the Grand Jury.

(*Id.* at 26:25-28-9 and 29:2-21.) Following that exchange, the prosecutor and a grand juror attempted to clarify the facts further with Agent Moore:

Q: And just to clarify that, in statements that Theresa Vincent made she indicated that at the time Terri's Farm was formed, at the time Terri's Farm obtained a DOT number, at the time Terri's Farm started commercial motor vehicle operations she knew that Dorian Ayache was having trouble with DOT?

A: That's right.

Q: And that Dorian Ayache – that DOT was somehow restricting the manner in which Dorian Ayache could conduct transportation operations; is that right?

A: That's correct.

Q: But we don't know that at that time she knew that something called the Imminent Hazard Order existed; is that correct?

A: That's correct. She was not aware of the name of the Imminent Hazard Order that he had been placed under until Motor Carrier actually approached her and advised her that it was an Imminent Hazard Order . . . . And so she knew he

7

was not able to operate, and it wasn't until Motor Carrier advised her that it was actually an Imminent Hazard Order.

GRAND JUROR: And when she found out it was an Imminent Hazard Order, . . . was she using these vehicles or doing anything after she found out or is the only thing we've seen is this proposition e-mail?

THE WITNESS: No, we have several inspections where they continued through July. We have inspections that were still under Terri's Farms [sic] and then on the 10th she – that's when she e-mailed asking if she could use his equipment. They told her no. And she was placed – subsequently she was placed under an Imminent Hazard Order later that month.

(*Id.* at 29:24-31:17.)

## II. Count Ten of the Indictment

Count Ten of the Indictment charges Ayache and Vincent with knowingly conspiring to defraud the United States or one of its agencies or departments for the purpose of impeding, impairing, obstructing, and defeating its lawful functions, in violation of 18 U.S.C. § 371. (Docket No. 1, Indictment.) The Indictment charges that, in furtherance of the conspiracy, Ayache and Vincent committed the following overt acts: (a) Vincent, with Ayache's assistance, registered for a new DOT number in her name, d/b/a Terri's Farm; (b) between July 16, 2012 and July 19, 2012, Ayache sold three commercial motor vehicles to Vincent; (c) on or about July 20, 2012, Ayache drove one of the impounded vehicles with Vincent's consent; (d) on or about July 26, 2012, Ayache and Vincent entered into a contract for the purchase of horses from Ayache; (e) on or about July 27, 2012, a driver for Terri's Farm, at Ayache and Vincent's direction, drove one of the impounded vehicles; (f) on or about July 29, 2012, a driver for Terri's Farm, at Ayache and Vincent's direction, drove one of the impounded vehicles; and (g) on or about August 1,

8

2012, Ayache sent Vincent an insurance identification card for one of the impounded vehicles, reflecting Ayache/Three Angels Farm as the named insured.

"To prove conspiracy the government must establish (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement [, and] a conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations omitted). "The government need not establish proof of a formal agreement, "because acts done with a common purpose can establish an implicit agreement." *United States v. Milligan*, 17 F.3d 177, 183 (6th Cir. 1994). "Once the existence of a conspiracy is established, slight evidence is sufficient to implicate a defendant." *Id.* (citations omitted). However, a defendant "must know the purpose of the conspiracy." *Id.*

Here, Ayache contends that Count Ten of the Indictment should be dismissed because the prosecutor and Agent Moore presented false testimony to the grand jury concerning the necessary elements of Vincent's *mens rea* relative to the alleged conspiracy. Ayache argues that, if this false testimony had not been presented, the grand jury would not have charged a conspiracy as to Count Ten because the element of Vincent's *mens rea* would have been lacking. Ayache identifies three passages in Agent Moore's testimony that he believes reflect "false" testimony: (1) Agent Moore's asserted "understanding" that, when Terri's Farm was formed, Vincent knew that Ayache could not haul loads himself and yet let him drive for Terri's Farm anyway; (2) Moore's answer to the grand juror's compound question relating to Terri's Farm operations after

9

Vincent learned of the First IHO; and (3) Agent Moore's allegedly misleading characterization of Vincent's August 14, 2012 "proposition" email."

## STANDARD FOR MOTION TO DISMISS BASED ON GRAND JURY FRAUD

A defendant who wishes to challenge an indictment valid on its face "bears a heavy burden indeed." *United States v. Markey*, 693 F.2d 593, 596 (6th Cir. 1982). The "validity of an indictment is not affected by the type of evidence presented to the grand jury, even though that evidence may be incompetent, inadequate or hearsay." *United States v. Powell*, 823 F.2d 996, 1000 (6th Cir. 1987) (quoting *Markey*, 693 F.2d at 596). "Because of the well-accepted principle that grand jury indictments are presumed valid, we exercise extreme caution in dismissing an indictment for alleged grand jury misconduct." *United States v. Overmyer*, 899 F.2d 457, 465 (6th Cir. 1990).

> In light of these principles, Ayache's burden is onerous:
>
> This Circuit applies a strict standard for dismissal of an indictment because of alleged prosecutorial misconduct before the grand jury. The appellants must demonstrate that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district." *United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir. 1985) []. In addition to showing long-standing misconduct, "a defendant who seeks dismissal of an indictment . . . must show that he was prejudiced by the prosecutor's actions" before the grand jury. *Id.* Prejudice is only possible, of course, if there was some actual impropriety by the government's attorney.

*United States v. Azad*, 809 F.2d 291, 294 (6th Cir. 1986).

To show actual prejudice, a defendant must show that there is not "*some* competent evidence to sustain the charge issued by the Grand Jury even though other evidence before it is incompetent or irrelevant in an evidentiary sense or even false." *United States v. Adamo*, 742 F.2d 927, 939 (6th Cir. 1984) (emphasis in original) (quoting *Coppedge v. United States*, 311

10

F.2d 128, 132 (D.C. Cir. 1962)). Furthermore, "federal courts are not permitted to test the evidence supporting an indictment." *Adamo*, 742 F.2d at 949.

The Sixth Circuit has also repeatedly affirmed the requirement that a defendant must show that "prosecutorial misconduct is a long-standing or common problem in the grand jury proceedings in [the] district." *United States v. Nembhard*, 676 F.2d 193, 200 (6th Cir. 1983) (stating that the defendant must show that the "the government misconduct is widespread or extraordinarily serious"); *see also Griffith*, 756 F.2d at 1249; *Azad*, 809 F.2d at 294; *Markey*, 693 F.2d at 596; *United States v. Smith*, 687 F.2d 147, 153 (6th Cir. 1982); *United States v. Castro*, 908 F.2d 85, 89 (6th Cir. 1990). Furthermore, to support a showing of prosecutorial misconduct, the defendant must show that the prosecutor had knowledge that the testimony elicited was false – mere "doubts about the accuracy" of the testimony are insufficient. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988); *United States v. Rice*, 90 F. App'x 921, 926 (6th Cir. 2004) (affirming district court's refusal to dismiss indictment, where defendant "failed to show that the prosecutor knew of the witness's supposed embellishments before the grand jury").

## ANALYSIS

Ayache has failed to meet any of the elements necessary to support dismissal of the indictment for grand jury misconduct.

### I. No False Testimony

The court disagrees with Ayache's premise that the government presented false testimony to the grand jury. *Vincent herself* admitted in her grand jury testimony that she was aware before forming Terri's Farm that the DOT had restricted Ayache's ability to utilize trucks and that, in her own words, "*I knew that he was not allowed to haul loads.*" Although Vincent attempted to

draw a distinction between Ayache's ability to drive for Three Angels Farm and his ability to drive for Terri's Farm (which Vincent claimed she thought would be legal), the prosecutor's question-and-answer exchange with Agent Moore on this topic was truthful and accurately reflected earlier testimony by Vincent to the grand jury.

As to the "proposition" email, as the court already discussed on the record on February 28, 2014 in its findings concerning Ayache's Motion to Suppress, the August 14, 2012 email from Vincent to Ayache had all the trappings of a sham transaction or, at a minimum, an attempt to evade DOT restrictions in an underhanded manner. Although Ayache has argued that that email could be interpreted innocently, the text supports Agent Moore's testimony regarding its substance, even if Agent Moore's interpretation is not the only conceivable interpretation thereof. Thus, Agent Moore's testimony concerning the email was not false or materially misleading.

Agent Moore's response to the grand juror's compound question was not false or materially misleading, particularly when taken in the context of other testimony that made abundantly clear that Vincent was not specifically aware of the First IHO until the DOT informed her of it and that Terri's Farm ceased motor vehicle operations after Vincent received the Second IHO. Although neither the grand juror's compound question nor Agent Moore's response to that question (if taken in a vacuum) were a perfect model of clarity, the court finds that Agent Moore's response was accurate when taken in context.

Finally, because Agent Moore did not testify falsely, Ayache cannot show that the prosecutor knew that Agent Moore had made any false statements.

## II. No Actual Prejudice

Even if the court were to assume *arguendo* that these three statements were false or

12

misleading, Ayache has not shown actual prejudice. Indeed, even without these statements, the grand jury testimony reflected a host of circumstantial evidence indicating that Vincent possessed the requisite *mens rea* to support the conspiracy change against her and Ayache. For example, the testimony indicated that Vincent knew that Ayache and Three Angels Farm had been placed out of service by the DOT, that he "was not allowed to haul loads," and that he "had problems" with the DOT and was limited in his ability to operate – problems that Vincent apparently discounted as "political crap." She also admitted to believing that Ayache had approached her to create a business in her own name specifically because of the DOT restrictions. Notwithstanding this knowledge, she purchased Ayache's trucks without discussing how the DOT restrictions might apply to them, allowed Ayache to guide her through setting up the business, allowed Ayache and his former drivers to drive for the new business, let Ayache handle a substantial amount of the new company's business affairs, hauled loads only for Ayache, left the insurance on the vehicles in Ayache's name, did not obtain adequate title showing her interest in the trucks, and ran a cash-only business with no bank account.

The grand jury testimony also contained multiple indications of a cover-up by Vincent. Shortly after receiving the Second IHO, Vincent handed over all of Terri's Farm's records to a colleague who in turn destroyed them. Vincent also apparently lied to the grand jury about the nature of her recent communications with Ayache, claiming that she had not talked to him in at least five months, where phone records showed multiple phone calls between Vincent and Ayache within the two months preceding her grand jury testimony, including several discussions shortly after receiving the March 8, 2013 subpoena and shortly before her May 22, 2013 testimony to the grand jury. Given the timing and duration of these calls, the grand jury certainly

could have inferred that Vincent was also lying when she claimed not to have discussed with Ayache the government's ongoing investigation or her upcoming grand jury appearance. Furthermore, Vincent initially did not produce any documents in response to the grand jury subpoenas and, after being pressed by the government, made an incomplete production of emails thereafter.

Under the circumstances, the grand jury was entitled to discredit self-serving testimony by Vincent about her actual motivation in setting up and operating Terri's Farm through service of the Second IHO. Again, "[a] tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement [, and] a conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations omitted). Even without reference to the statements challenged by Ayache here, the evidence before the grand jury manifestly contained circumstantial evidence tending to show the existence of a conspiracy between Ayache and Vincent designed to frustrate or otherwise evade the DOT's directives.

**III.     No Showing of a "Long-Standing or Common Problem" in the Middle District of Tennessee.**

In his Reply, Ayache acknowledges that he has not presented evidence or argument supporting a finding that there is a "long-standing or common problem" of prosecutorial misconduct in grand jury proceedings in Tennessee. Ayache argues that the Sixth Circuit's rule is "unrealistically rigid," "unsound", and not required by Supreme Court precedent. He contends that the rule ignores the reality that grand jury proceedings are secret, meaning that, even if there were a long-standing problem, defendants would not know about it, let alone be able to prove it. Whatever the merits of this argument, this court is bound to apply the strict Sixth Circuit

standard, which the Sixth Circuit has consistently reiterated since its adoption.

Acknowledging that he cannot meet this element, Ayache states that, because he has "made a substantial threshold showing," he is entitled to discovery of all grand jury transcripts for the past two years involving the prosecutor in this case and Agent Moore. For the reasons stated in the previous two sections, the court has found that Ayache has not otherwise shown the necessary elements for his grand jury prosecutorial misconduct defense. Having made that determination, the court finds that no discovery is warranted.

## **CONCLUSION**

For the reasons stated herein, Ayache's Motion to Dismiss Count Ten (Docket No. 34) of the Indictment will be denied. The court's holding will apply equally to Vincent.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge